UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DEXTER ROBERTS,

                            Plaintiff,

        -vs-                                                    08-CV-274-JTC

FRUIT FRESH UP,

                            Defendant .

_____

APPEARANCES:        RICHARD H. WYSSLING, ESQ., Buffalo, New York, Attorney
                    for Plaintiff.

                    BRIAN N. LEWANDOWSKI, ESQ., West Seneca, New York,
                    Attorney for Defendant.

        By order of United States District Judge Richard J. Arcara dated June 28, 2011

(Item 31), this matter has been reassigned to the undersigned for all further proceedings.

        Plaintiff Dexter Roberts commenced this action against his former employer,

defendant Fruit Fresh Up, Inc. ("FFU") on April 3, 2008, alleging that defendant failed to

promote him and subjected him to a hostile work environment because of his race, in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1).

On December 30, 2008, plaintiff commenced a second action against defendant (No. 09-

CV-007-RJA) alleging that defendant terminated his employment in retaliation for filing a

discrimination charge against defendant, in violation of Title VII, 42 U.S.C. § 2000e-3(a).

The actions have now been consolidated (*see* Item 30), and defendant has moved

pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment (Item

20) dismissing all claims.

For the reasons that follow, defendant's motion is granted.

## BACKGROUND

Plaintiff Dexter Roberts is an African-American male who was hired by defendant FFU, Inc. as a temporary employee in March 2004 (Item 26-2, ¶¶ 1, 2). FFU is in the business of providing prepackaged fruit and related products to supermarkets and grocery stores (Item 22, ¶ 3). Plaintiff was initially hired as a seeder and was trained to process food products on the assembly lines in the plant (*id.* at ¶ 6). In August 2004, plaintiff was promoted to line leader, a position in which he supervised workers on his assembly line (Item 26-2, ¶¶ 3, 4). As a line leader, plaintiff reported to three supervisors–the production manager, the production supervisor, and the distribution and warehouse manager (Item 26-3, ¶ 8; Item 27-2, ¶ 25).

From spring 2005 through June 2006, defendant sought to fill vacant production supervisor positions (Item 21-2, ¶¶ 8, 13). Plaintiff states that defendant's owner, Ronald Santora, announced at a plant meeting that he intended to promote line leaders to the vacant production supervisor positions (Item 26-2, ¶ 9). Plaintiff alleges that his production manager ("John K.") told him he was qualified for the promotion to production supervisor, and that he would recommend plaintiff for the promotion (Item 26-2, ¶ 8). Defendant's internal job description states that applicants for production supervisor "[m]ust have [a] 4 year college degree or [the] equivalent of 7-10 years of direct supervisor experience" (Item 21-3). Plaintiff did not have a four-year college degree, and he listed no prior management experience on his initial FFU application dated March 4, 2004 (Item 21-4). Defendant reviewed the credentials of its line leaders–including plaintiff's–and determined that none

of its line leaders were qualified for the production supervisor position (Item 21-2, ¶¶ 14, 15).  Therefore, defendant did not promote plaintiff to a production supervisor position (Item 21-2, ¶ 9).

Instead, on June 12, 2006, FFU hired Daniel Beauchamp, a Caucasian, for the production supervisor position (Item 21-2, ¶ 13).  At the time of his hiring, Mr. Beauchamp's résumé reflected that he had over 31 years of supervisory experience, and held certificates in supervisor studies and management skills from Cornell University's School of Industrial and Labor Relations (Item 21-5, at 2-3).  However, he did not have a four-year college degree (*id.*).

While defendant was searching for production supervisor candidates, all three plant supervisors were Caucasian (Item 26, at 3).  Plaintiff alleges that defendant discriminated against him when defendant refused to promote plaintiff–an African-American male–to the position of production supervisor, and instead hired Mr. Beauchamp–a Caucasian who did not meet the education criterion for the position (Item 26, at 2).

In late 2006, defendant held a focus meeting in the plant to determine the cause of its low employee retention level (Item 26-3, ¶ 29).  Of the six employees who participated in the focus meeting, three were minorities, including plaintiff (*id.*).  Plaintiff stated that FFU employees were unhappy because of discrimination and favoritism in the plant (*id.* at ¶ 30).  Specifically, plaintiff stated that Caucasian females were allowed to bypass the rotation among line leaders and perform easier tasks in the factory for line leader Kelly Carroll, a Caucasian female (*id.* at ¶¶ 32, 34).  At the time of this alleged discrimination and favoritism, five of defendant's six line leaders were African-American, and the Caucasian females were paid at the same rate as the African-American employees (*id.* at ¶¶ 31, 33).

-3-

Plaintiff alleges that he was subjected to offensive discriminatory comments at FFU. In one such instance, his supervisor told him that a minority coworker in the plant called plaintiff a "bitch-ass nigger" (Item 24-3, at 143-45).   In another instance, plaintiff's supervisor confronted him near the end of a workday, took papers from his hand, and said "give me those papers, bitch" (*id.* at 145-46).   Plaintiff alleges that his supervisor called him "bitch" on "several occasions" (*id.* at 146-47), comments which plaintiff interpreted to be racist insults (Item 26-3, ¶ 39).

Plaintiff also alleges that defendant's Caucasian supervisors excluded line leaders from the supervisors' office for no reason (Item 26-2, ¶ 14), perpetuating a segregated workplace (*id.* at ¶13).   Defendant contends that access was restricted solely to supervisors because the office contained employee job performance notes, evaluations, disciplinary notices, and other confidential information (Item 27-2, ¶¶ 27, 28).   Defendant restricted access to the office because management became aware that employee personnel records were visible on the desk and were not being kept confidential; as a result, all non-management employees were prohibited from accessing the supervisors' office (*id.* at ¶¶ 28, 29).   While plaintiff had access to the supervisors' office prior to the policy change, his position as a line leader did not require him to have office access (Item 26-3, ¶ 23).   After the supervisors' office was restricted, defendant provided the line leaders access to a separate office area (*id.*).

The record reflects that defendant disciplined plaintiff for job performance and behavioral problems on multiple occasions.   For example, defendant issued plaintiff written warnings for negligently mislabeling product shipments to customers on October 20, 2006 and July 13, 2007 (Item 21-9; Item 21-13).   On January 11, 2007, defendant issued plaintiff

a written warning for an altercation with a minority employee which left the employee feeling threatened (Item 21-11).  Defendant told plaintiff that verbal threats would not be tolerated at FFU (*id.*).  On September 7, 2007, defendant issued plaintiff a written warning for insubordination for "using foul language and making accusing statements" to his manager (Item 21-14).  Plaintiff was informed that "[t]his behavior will NOT be tolerated, [and] any further instances will result in immediate termination" (*id.*).  Four days later, on September 11, 2007, defendant issued plaintiff yet another written warning for insubordination after he entered his manager's office and yelled in his face about the previous written warning (Item 21-15).  However, plaintiff was not terminated at this time.

In September 2007, defendant began to experience financial difficulties due to a decline in sales from its largest customer, and subsequently planned to reduce its workforce and demote employees to reduce costs (Item 21-2, ¶¶ 39, 40).  Layoffs were to be based on a point system that defendant's management staff explained to workers in a meeting in September 2007:  line leaders would be rated by total performance, including communication, quality, efficiencies, knowledge, attitude, and attendance, and the employees with the highest points total would be laid off (*id.* at ¶¶ 41, 43; Item 21-16). Plaintiff alleges that this layoff evaluation system differed from defendant's past practice, in which defendant would determine layoffs by reviewing employees' attendance, and that evaluating employees using the subjective point system allowed defendant to unfairly implement the system and discriminate against African-American employees (Item 26-3,

¶ 51).  Furthermore, plaintiff points out that the Caucasian female line leader, Kelly Carroll, was not evaluated under this point system (*id.*).[1]

Later in September 2007, plaintiff received "Unacceptable" or "Below Average" rankings in ten out of fourteen categories in his line leader review which, when combined with his attendance record, placed him with the second-highest points total among five line leaders, all of whom were African-American (Item 21-16; Item 21-2, ¶ 44).  Willie Mae Hagans, the only line leader with a higher points total than plaintiff, was initially demoted by defendant (Item 21-2, ¶ 46).  Hagans was not immediately terminated because December was a high-volume month in the plant and defendant's management was unsure of the severity of its declining sales (Item 27-2, ¶¶ 38, 39).  However, Hagans was eventually terminated at the end of 2007 (*id.* at ¶ 38).

Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission on October 3, 2007 ("EEOC discrimination charge") (Item 24-6, at 1).  Plaintiff alleged that defendant refused to promote him to production supervisor because of his race, and instead hired a Caucasian candidate from outside the company for the position (*id.*).  In addition, plaintiff alleged that he experienced a hostile work environment because defendant's managers "subjected [him] to unfair discipline and offensive comments because of [his] race" (*id.*).  The EEOC dismissed the charge on January 11, 2008, finding that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes" (Item 24-7, at 1).

---

[1] Defendant terminated Kelly Carroll for cause on November 8, 2007 (Item 27-2, ¶ 34).

In January 2008, after defendant's end-of-the-year busy season, management evaluated its workforce needs and determined that defendant did not need more than three line leaders (Item 27-2, at ¶ 40).  Defendant had previously terminated Hagans–the only line leader with a higher points total than plaintiff, and Carroll–the only Caucasian line leader, leaving defendant with four line leaders.  Defendant terminated plaintiff on January 17, 2008, and three line leaders remained, all of whom were African-American (*id.* at ¶¶ 41, 42).

Plaintiff filed a second discrimination charge with the EEOC on February 4, 2008 ("EEOC retaliation charge"), alleging that defendant terminated plaintiff "to retaliate against [him] for filing a charge of employment discrimination and to intimidate others who might consider filing employment discrimination charges" (Item 24-19, at 1).  Plaintiff alleged that defendant terminated him six days after the EEOC discrimination charge was dismissed even though he had worked for defendant for longer "than about 90%" of its employees (*id.*).  Plaintiff stated that he was a valuable employee because he was the only line leader able to run all of the processing lines (*id.*).  Plaintiff also alleged that defendant historically based layoffs on points for absenteeism and tardiness, and that plaintiff had "fewer points for absence and tardiness than many or most of the other employees" (*id.*).

On April 3, 2008, before the EEOC completed its review of the retaliation charge, plaintiff filed this federal court action alleging that defendant failed to promote him because of his race, and subjected him to a hostile work environment, in violation of Title VII (Item 1 at 7, 8).

On October 15, 2008, the EEOC concluded its review of the retaliation charge and issued plaintiff a "Notice of Right to Sue" which stated as follows:

The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the [defendant] that would provide relief for [plaintiff].  In addition, the EEOC has decided that it will not bring suit against the [defendant] at this time based on this charge and will close its file in this case.  This does not mean that the EEOC is certifying that the [defendant] is in compliance with the law, or that the EEOC will not sue the [defendant] later or intervene later in [plaintiff's] lawsuit if [plaintiff] decide[s] to sue on [his] own behalf.

(No. 09-CV-007-RJA, Item 1, at 10).

Plaintiff then filed his second federal court complaint on December 30, 2008, alleging that defendant terminated him in retaliation for filing the October 2007 EEOC discrimination charge (*id.* at 8).

Defendant has moved for summary judgment to dismiss all claims.  For the following reasons, the motion is granted.

## DISCUSSION

### I.    Summary Judgment

Rule 56 provides that summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and facts are "material" if they "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the burden of showing the absence of a genuine issue of material fact, and the proffered evidence must be viewed in the light most favorable to the nonmovant.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If the movant

meets this burden, the burden then shifts to the nonmovant to come forward with evidence "sufficient to satisfy every element of the claim."  *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).  However, the nonmovant "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

This Circuit has emphasized that courts should be especially cautious in granting summary judgment in employment discrimination cases, where the employer's intent is usually a central factual issue.  *See Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 87 (2d Cir. 1996).  "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

## II.    Failure to Promote

Title VII forbids an employer from failing to promote an individual because of his race.  *See* 42 U.S.C. § 2000e-2(a)(1).  In a Title VII case where there is no direct evidence of discriminatory conduct, courts apply the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to determine whether summary judgment is appropriate.  *See, e.g., Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (*en banc*).

First, the plaintiff bears the initial burden of establishing a *prima facie* case of racial discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  To establish a *prima facie* case, the plaintiff must show that:  (1) he is a member of a protected class; (2) he was qualified for

the position he sought; (3) he suffered an adverse employment action; and (4) such adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *See Cristofaro v. Lake Shore Cent. Sch. Dist.*, 2011 WL 635263, at *9 (W.D.N.Y. Feb. 11, 2011) (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Weinstock*, 224 F.3d 33, 42.

Second, assuming the plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802-03.  Third, if the defendant satisfies this burden of production, the ultimate burden then shifts back to plaintiff to show that defendant's proffered reasons were merely a pretext for an impermissible discriminatory motive.  *Id.* at 804; *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006).

Plaintiff, as an African-American, is a member of a protected class.  In addition, it is well settled that being passed over for a promotion satisfies the adverse employment action element.  *Barrow v. Ford Motor Co.*, 2007 WL 1655660, at *13 (W.D.N.Y. June 5, 2007) (citing *Demoret v. Zegarelli*, 451 F.3d 140, 152 (2d Cir. 2006) (lack of promotion meets third prong for *prima facie* case of employment discrimination under Title VII)).  At issue here, then, is whether plaintiff was qualified for the position he sought.

This Circuit has held that being "qualified" "'refers to the criteria the employer has specified for the position.'"  *Adamczyk v. New York State Dept. of Corr. Servs.*, 2011 WL 917980, at *6 (W.D.N.Y. Mar. 14, 2011) (quoting *Thornley v. Penton Publ'g, Inc.,* 104 F.3d

26, 29 (2d Cir. 1997)).  Accordingly, plaintiff must demonstrate that he met defendant's criteria for the production supervisor position.

As indicated above, defendant's criteria for the position of production supervisor required a four-year college degree or the equivalent of seven to ten years of direct supervisory experience (Item 21-3).  Plaintiff lacked a college degree; and when he applied for his initial position at FFU in March 2004, he did not have any experience as a supervisor (Item 21-4).  Plaintiff was promoted in August 2004 to a supervisory position as a line leader (Item 26-2, ¶ 3), but would have had less than two years of supervisory experience at the time when FFU was hiring production supervisors in 2005-06 (Item 21-2, ¶¶ 8, 13).

Plaintiff argues that defendant passed him over for the production supervisor position because of his race, and instead hired Mr. Beauchamp, a Caucasian who also lacked the required education for the position (Item 26, at 2).  While Mr. Beauchamp did not have a four-year college degree, he did hold certificates in supervisor studies and management skills from Cornell University's School of Industrial and Labor Relations–course work directly related to the duties of the production supervisor position at FFU (Item 21-5).  Plaintiff, on the other hand, listed no education past high school (Item 21-4).  In addition, Mr. Beauchamp had over 31 years of relevant supervisory experience (Item 21-5), while plaintiff had, at most, less than two years of supervisory experience at FFU (Item 27-2, ¶ 16).

Plaintiff asserts that his production manager told him that he was qualified for the production supervisor position and that he would recommend plaintiff for the position (Item 26-2, ¶ 8).  However, according to the affidavit of defendant's corporate secretary Suzanne

Krebs, there are no written recommendations from FFU management in plaintiff's personnel file, nor is there any other indication that a management employee ever recommended him for the position (Item 27-2, ¶ 24).  Ms. Krebs stated that plaintiff "did not receive a promotion to production supervisor due to his lack of relevant experience and education" (*id.* at ¶ 10).

Based on this record, no reasonable jury could find that plaintiff has satisfied his *prima facie* burden on his failure to promote claim.  Accordingly, defendant is entitled to summary judgment dismissing this claim.

## III.   Hostile Work Environment

Title VII forbids an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).   "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

To establish a hostile work environment claim under Title VII, a plaintiff must (1) demonstrate that his workplace was permeated with "'discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" and (2) demonstrate a specific basis for imputing the conduct that created the hostile work environment to his employer.

*Rosinski v. American Axle & Mfg., Inc.*, 663 F. Supp. 2d 197, 206 (W.D.N.Y. 2009) (citing *Harris*, 510 U.S. at 21 (1993)), *aff'd,* 402 Fed. Appx. 535, 537 (2d Cir. 2010).  Determining whether a workplace is hostile or abusive requires weighing the facts and circumstances giving rise to the complaint, and examining factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *See Harris*, 510 U.S. at 23.

Plaintiff alleges that defendant created a hostile work environment because his supervisors at FFU subjected him to unfair discipline and offensive comments because of his race (Item 24-3, at 141), demonstrated favoritism toward Caucasian employees (Item 1, at 8), and segregated the office areas (Item 26-2, ¶ 13).  Beyond conclusory assertions in the EEOC discrimination charge that he was disciplined unfairly because of his race (Item 1, at 10), plaintiff provides no facts that connect defendant's disciplinary actions to his race.  To the contrary, the record reveals that plaintiff received counseling after an argument with a coworker on October 10, 2004 (Item 21-7), and received a written warning after threatening a coworker on January 11, 2007 (Item 21-11).  After plaintiff cursed at his supervisor and acted insubordinately on September 7, 2007, defendant warned plaintiff that further behavioral problems would result in immediate termination (Item 21-14).  Four days later, plaintiff received a final written warning for a separate instance of insubordination after yelling in his supervisor's face about the previous warning (Item 21-15).

Defendant also documented three instances in which plaintiff negligently performed his job duties, including two written warnings for mislabeling products that were delivered

to customers (Items 21-8, 21-9, 21-13).  Plaintiff offers no evidence that these disciplinary incidents were connected in any way to his race.

As reflected in the discussion above, plaintiff also alleges that he was subjected to offensive comments at FFU.  While the language used was boorish and inappropriate for the workplace, these isolated incidents are not severe or pervasive enough to alter plaintiff's work environment.  *See Rosinski*, 663 F. Supp. 2d at 207 (citing *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.")).  "For racist comments, slurs, and jokes to constitute a hostile working environment, . . . 'there must be a steady barrage of opprobrious racial comments.'"  *Schwapp*, 118 F.3d at 110 (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)).  The isolated incidences of offensive comments at FFU were not severe enough to alter plaintiff's workplace environment.

Plaintiff also alleges that Caucasian females often were allowed to work for the Caucasian female line leader and perform easier tasks like making dip or labeling boxes, while other employees were forced to stay in the general rotation among line leaders and perform more difficult tasks in the plant (Item 24-3, at 133-34; Item 26-2, ¶¶ 21, 22).  However, plaintiff acknowledges that the Caucasian females were not paid more than minority coworkers, and that line leaders had the ability to assign employees or move them around the lines (Item 24-3, 133, 138).  Furthermore, plaintiff has not demonstrated that employees were moved among lines by race instead of by ability or line leaders' choice, or that the alleged favoritism affected his ability to perform his job duties.

-14-

Plaintiff argues that defendant's decision to restrict access to the supervisors' office and to create a separate office space for line leaders perpetuated a hostile work environment because the supervisors were all Caucasian and five of the six line leaders were African-American.  However, plaintiff offers no evidence to indicate that defendant's management intended to segregate employees on the basis of their race, or that plaintiff's manager or coworkers referred to the office layout in a manner that would demonstrate awareness among employees that the office was segregated.  *Cf. Bookman v. Merrill Lynch*, 2009 WL 1360673, at *3, *18 (S.D.N.Y. May 14, 2009) (finding question of fact as to whether a segregated seating arrangement contributed to a hostile work environment where management and other employees referred to the mostly African-American seating area as the "crows [sic] nest" or "segregated section," and where the manager explained to the plaintiff that the arrangement "[was] better than sitting at the back of the bus"). Rather, the record reflects that line leaders do not need access to the supervisor's office to perform their job duties; and, as explained by Suzanne Krebs, access to the office was restricted to supervisory personnel after management learned that confidential employee records in the office were not being kept confidential (Item 27-2, ¶¶ 25-30).  Thus, defendant has articulated a legitimate, non-discriminatory reason for restricting access to the supervisors' office, and plaintiff cannot show how the restriction unreasonably interfered with his work performance.

Based on this analysis, the court finds the evidence in the record sufficient to establish that the disciplinary action taken by defendant against plaintiff was the result of clearly documented behavioral and productivity issues, and that the comments plaintiff viewed as offensive were too infrequent and mild to alter his workplace environment.

Similarly, the alleged favoritism shown toward Caucasian females at FFU and the allegedly segregated office environment had no bearing on plaintiff's ability to perform his job duties, and thus did not create or contribute to an abusive work environment. Accordingly, no reasonable jury could find in favor of plaintiff on his hostile work environment claim, and defendant is entitled to summary judgment dismissing this claim.

## IV.    Retaliation

Title VII forbids an employer from retaliating against employees who participate in protected activities, such as filing a lawsuit or an administrative charge challenging discriminatory practices or actions. *See* 42 U.S.C. § 2000e-3(a). Retaliation claims pursuant to Title VII are examined under the same *McDonnell Douglas* three-part burden-shifting framework utilized for discrimination claims. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).

To withstand a motion for summary judgment, the plaintiff must first come forward with a sufficient *prima facie* showing that: (1) he participated in a protected activity that was known to the defendant; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Second, assuming the plaintiff establishes a *prima facie* case of retaliation, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). Third, if the defendant satisfies this burden of production, the ultimate burden then shifts back to

the plaintiff to show that the defendant's proffered reasons were merely a pretext for

retaliation.  *See Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d. Cir. 2001).

Plaintiff easily satisfies the first two elements of his *prima facie* case of retaliation:

he filed a charge with the EEOC, and was terminated by defendant after the EEOC made

its determination. At issue here, then, is whether a causal connection exists between the

protected activity–plaintiff's filing a charge with the EEOC–and the adverse employment

action–plaintiff's termination.

The Second Circuit

> has consistently held that proof of causation can be shown either: (1)
> indirectly, by showing that the protected activity was followed closely by
> discriminatory treatment, or through other circumstantial evidence such as
> disparate treatment of fellow employees who engaged in similar conduct; or
> (2) directly, through evidence of retaliatory animus directed against the
> plaintiff by the defendant.

*Gordon v. New York City Bd. of Ed.*, 232 F.3d 111, 117 (2d Cir. 2000).  Here, plaintiff

proffers no direct evidence of retaliatory animus by defendant after filing his first EEOC

discrimination charge on October 3, 2007.  Indeed, any actions taken by defendant that

could be construed as retaliatory occurred before plaintiff filed his first EEOC discrimination

charge.   The last disciplinary action defendant took against plaintiff occurred on

September 11, 2007 (Item 21-15), and plaintiff's poor performance review also occurred

in September 2007 (Item 21-16).   In addition, other than a conclusory statement

unsupported by facts in the record that defendant terminated plaintiff to "intimidate others

who might consider filing employment discrimination charges" (No. 09-CV-007-RJA, Item

1), plaintiff has proffered no circumstantial evidence to prove causation.

Plaintiff attempts to prove causation by relying on the obvious temporal proximity between the dismissal of his EEOC discrimination charge on January 11, 2008, and his termination on January 17, 2008 (*id.*).  To accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient to prove causation, that temporal proximity must be "very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  While there is no bright-line rule defining "very close" temporal proximity, "[m]ost of the decisions in this Circuit that have addressed this issue have held that lapses of time shorter than even three months are insufficient to support an inference of causation."  *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503-04 (S.D.N.Y. 2010) (citing cases).  Accepting the January 11, 2008 date of dismissal of the EEOC charge as the date defendant became aware of the protected activity,[2] plaintiff's termination from employment six days later easily falls within this range.

However, where the plaintiff's discipline is already underway prior to engaging in a protected activity, this Circuit has held that temporal proximity alone is insufficient to make out a *prima facie* case of retaliation:

> But in this case the adverse employment actions were both part, and the ultimate product, of "an extensive period of progressive discipline" which

---

[2]For the purpose of analyzing the time period between the defendant's knowledge of the protected activity and the adverse employment action, the court has used the dismissal date of the EEOC discrimination charge as the date defendant became aware of the protected activity.  It is important to note, however, that defendant likely had notice of the EEOC discrimination charge within ten days of plaintiff's filing of the EEOC discrimination charge on October 3, 2007.  *See* 29 C.F.R. § 1691.5(a) ("Within ten days of receipt of a complaint of employment discrimination, an agency shall notify the respondent that it has received a complaint of employment discrimination . . . .").  If defendant received notice ten business days after the EEOC charge was filed, October 17, 2007 would be the notice date.  As such, three months would have elapsed between defendant's notice of the charge and plaintiff's termination.

However, neither party has documented when defendant received notice of the EEOC complaint, and drawing this inference in favor of the plaintiff, the court will use the January 11, 2008 dismissal letter from the EEOC as the date defendant received notice of the protected activity.

began when [the defendant] diminished [the plaintiff]'s job responsibilities a full *five months prior* to his filing of the EEOC charges.  Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.2001), *cert. denied*, 534 U.S. 951 (2001), *quoted in White v. Eastman Kodak*, 2009 WL 1514659, at *10-11 (W.D.N.Y. May 29, 2009).

In this case, plaintiff received his first written warning for mislabeling a shipment to a customer on October 20, 2006 (*see* Item 21-9)–over *eleven months before* plaintiff filed his first EEOC discrimination charge on October 3, 2007.  He received another written warning for negligently mislabeling products on July 13, 2007 (Item 21-13).  In addition, plaintiff received a written warning for threatening a coworker on January 11, 2007 (Item 21-11), and another for insubordination on September 7, 2007, behavior which defendant stated "will NOT be tolerated, [and] any further instances will result in immediate termination" (Item 21-14).  Plaintiff received a final written warning for insubordination on September 11, 2007, and defendant again threatened to terminate plaintiff's employment (Item 24-15).  Plaintiff's extensive disciplinary history at FFU preceding his EEOC discrimination charge, therefore, precludes reliance on temporal proximity to make out a *prima facie* case of retaliation.

Even were this court to assume that plaintiff could prove a *prima facie* case of retaliation, defendant satisfies the second step in the burden-shifting analysis because a legitimate, nondiscriminatory reason for terminating plaintiff exists:  a decline in business (Item 21-2, ¶ 39), which was known to plaintiff in September 2007 (Item 24-5, at 164-66),

and a decline which plaintiff knew to be the cause for an upcoming round of layoffs (Item 21-2, ¶¶ 39-43).  *See McKnight v. Graphic Controls Corp.*, 2000 WL 1887824, at *7 (W.D.N.Y. Dec. 11, 2000) (finding legitimate, nondiscriminatory reason for termination where "plaintiff's position was eliminated due to the decline in sales of the product line with which he was associated").  Therefore, the burden of production shifts back to plaintiff to show that defendant's proffered reason for termination was mere pretext for retaliation. *See Cifra,* 252 F.3d at 216.  A defendant's proffered non-discriminatory reason "cannot be prove[n] to be a 'pretext for discrimination' unless it is shown *both* that the reason was false, and that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in original), *quoted in Olle v. Columbia Univ.*, 332 F. Supp. 2d 599, 617 (S.D.N.Y. 2004); *see also Damon v. U.P.S.*, 2010 WL 4340828, at *9 (W.D.N.Y. Nov. 2, 2010) (to avoid summary judgment on retaliation claim, plaintiff must establish the existence of a genuine issue of fact as to whether defendants' proffered explanations are false and a mere pretext for unlawful discrimination).

During his deposition, plaintiff testified that he witnessed a slowdown in production activity at defendant's plant in September/October 2007 (Item 24-5, pp. 164-66), and he attended a meeting in which defendant's management explained a points system for employee layoffs as a result of the business slowdown (*id.* at 176-82).  Upon implementing the point system evaluation, plaintiff scored the second-highest points total, placing him second in line for layoffs among line leaders (Item 21-16).  In the meantime, the only Caucasian line leader, Kelly Carroll, was terminated by defendant on November 8, 2007 (Item 27-2, ¶ 34).  In late 2007, defendant terminated Willie Mae Hagans, the only line

leader with a higher points total than plaintiff (*id.* at ¶ 38).   Plaintiff was terminated on January 17, 2008 (*id.* at ¶ 41).

Based upon this undisputed proof in the record, it is clear that plaintiff was aware of FFU's declining sales and management's plan to reduce the workforce, and that defendant carried out its layoffs in the manner in which it advised employees.   Accordingly, no reasonable jury could find in plaintiff's favor on his retaliation claim, and defendant is entitled to summary judgment dismissing this claim.

## CONCLUSION

Based on the foregoing analysis, and having drawn all reasonable inferences in the plaintiff's favor, the court finds no genuine issues of material fact for trial on any of plaintiff's discrimination claims in this consolidated action.   Therefore, defendant is entitled to judgment as a matter of law dismissing the complaint in its entirety.

Defendant's motion for summary judgment (Item 20) is granted, and the case is dismissed.   The Clerk of the Court is directed to enter judgment in favor of defendant.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated: July   7      , 2011
p:\pending\2008\08-274.june6.2011